May I please the court, my name is Olivier Taliou and I will be arguing on behalf of Retail Digital Networks. Okay, so the statute at issue creates a strange anomaly in California. For instance, as one drives on Sunset Boulevard, you can see a giant Patron billboard right above the liquor locker. Outside of the liquor locker, various advertisements, one for Jameson, Bud Light, and all of this is okay. The billboard is owned by Regency, so Regency gets paid for the billboard, and presumably the liquor store puts the advertisements on its own behalf without receiving a dime. You walk into the liquor store, there's advertisements everywhere. What cannot happen, and the thing that the statute prohibits, is for the liquor store to receive any money for any advertisement whatsoever inside or outside of the store. I think we understand that, but I'd like to know in your view, what does heightened judicial scrutiny under Sorrell entail, and can that heightened scrutiny be applied using the framework of the four-factor Central Hudson test? Right, and that is fundamentally the question raised here. So what does it entail? Well, I think that the heightened standard that Sorrell contemplates is higher than simply Central Hudson. So you think we have intermediate scrutiny and now we have I mean, in your view. In my view, it is where you have, and I think the 44 Liquor Mart opinion is enlightening on that issue, where you have a statute that not only is content, that prejudices against content, but also against speaker. You have to look at it critically, and Central Hudson doesn't necessarily do that, and I think the court in Sorrell recognized that when you have speech that's being that you do need to apply a heightened level of scrutiny. Well, can't you do it and then just on point four of Hudson do a little more? Yeah, I think so. I think so. Also, I mean, I think again, 44 Liquor Mart addresses the issue, which is that where you have, especially in the context of regulating alcohol sales, where you have a statute that tends to look disfavorably on a particular speaker, the government really needs to make a very, very strong argument that there is a substantial interest here, and that the substantial interest can be actually attacked. The district court here, though, said that ACME did the analysis under ACMEDIA, essentially, correct? Correct, and ACMEDIA is on all fours with this case, so we're obviously asking. But let's say, alright, but let's say, I'm just saying this hypothetically. If we were to find that ACMEDIA is no longer controlling, what should the panel do? Should we remand it to the district court to apply the heightened scrutiny in the first instance, and if necessary, take evidence, or should we decide it here? Well, my preference depends on where you're voting. I'm saying realistically. I mean, is that the district court did do the analysis. If we were to disagree and say that, you know, that Sorrell demands more than what the district court did. Correct, and I think, ideally, in my preference, Well, I know, but really, in terms of not just, okay, everyone wants to win. Alright, we accept all of that, but really, in terms of whether we do it here or whether we remand it and tell the district court, no, you've got to do more, plus four. And, again, I'll argue against my own self-interest here, but I think, realistically, the case should be remanded for further evidence of the district court and to actually enter into the analysis that is required by both 44 Lake or Martin and So what do we say to the district court? That's what puzzles me on this case, because I read the word heightened scrutiny and I, accepting your point of view that that means it's more than intermediate scrutiny, it's easy for us to say that, go apply the analysis to the district court, but I'm not sure if I'm sitting on the district court, I know what that means. I understand, and, again, I think that the analysis that is laid out in 44 Lake or Martin is enlightening, and I think that the Supreme Court really engaged into the type of central Hudson analysis that I think, or heightened analysis, sorry, heightened scrutiny analysis, which is really required in this case. And I think that the court, although it did rely on some of the evidence that was presented by the State of California here, I think the analysis was cursory at best and certainly didn't take into account the heightened scrutiny that was at least suggested by Sorrell and arguably mandated by 44 Lake or Martin. I see another issue that troubles me here, and I think that, you know, in terms of if we're going to say something, it's got to make sense, and that if in ACT Media this court found that Section 25503's primary purpose is to suppress vertical integration of the alcoholic beverage industry and that its second purpose is to inhibit advertising of alcoholic beverages at the point of sale. Now, let's assume that if we find that Section 25503's first purpose is permissible, but that the second purpose is impermissible under the Fifth First Amendment after Sorrell, is it your position that impermissible secondary purpose requires us to set aside 25503, notwithstanding the law's permissible non-protectual primary purpose? Do you see what I'm saying? I'm afraid I have to admit you lost me. Okay, but if you look at ACT Media, and they say that there were two purposes to the statute. Correct. Let's say you go back and do the analysis after Sorrell, and you say, okay, the first purpose is permissible under what I'll call is to suppress vertical integration, but that the second purpose that they mention isn't permissible any longer. So you have one permissible, you have one impermissible. What do we do then? And this is where I think the court here could actually strike down the statute as unconstitutional on the facts before it, because one of the prongs of Central Hudson is that there has to be a good fit, right, and that it has to be the least restriction on the First Amendment as possible. If you look at another section that's part of this framework, California Business and Professions Code 25503.8. 25503.8 basically allows advertising at the point of sale in a variety of venues, including stadiums and things of that nature. One of the provisions that it has there is that it, and there's a criminal enforcement, and it's section 3B. It says any purchase of advertising space or time conducted pursuant to subdivision A shall be conducted pursuant to a written contract entered into by the beer manufacturer, the holder of the wine grower's license, the California wine grower's agent, the distilled spirit manufacturer or the distilled spirit manufacturer's agent, and the on-sale licensee, which contract shall not in any way involve the holder of a wholesaler's license. By adding this provision in this section, California legislature has done away with vertical integration. That's how they can do it. They can control vertical integration simply by saying it's illegal for the wholesaler to pay for advertising, but it's legal for the brand to do it, which is essentially what is allowed in stadiums. The argument that's made is that the reason that they want to prohibit the payments for advertising to the liquor store owners is because it would be hard to tell whether that was really for advertising or for some impermissible purpose. Well, if you remove the wholesaler from the contracting relationship, then you have the brand advertising their brands, and ultimately that's what brands want to do. I'm sorry. Go ahead. No, you go ahead. That simply talks about the restriction. Correct, but if the purpose here is to prevent vertical integration, this does it. This takes it away, and so there are ways to prevent vertical integration that don't involve the First Amendment. You can make laws against it. You can have antitrust enforcement against it. There's a variety of laws that can be made that don't even involve free speech that can restrict vertical integration. So then you're making the least restrictive means argument. I think both of you are making this case. You're making it more simple to win than it really is for the court to decide. I'm going to ask the same questions of the government because I think after Sorrell, you can't do it just to suppress the speech, but then on the issue of whether the government can have speech of temperance, maybe the government can, but is this what this is? Is it suppressing, you know, you guys want, you know, just drink a lot of beer, okay? Drink a lot of beer, and I think you can say that, but the question is this vertical integration, I think arguably that can be a governmental interest, but is it here, or is it protectual? You know, both sides are putting it on an all-win for you, but I think arguably there might be one reason that's not valid after Sorrell, but there might be one reason that is, but what does that do to the entire scheme? Well, I think, you know, to the extent that if the court finds that the statute is not narrowly tailored enough, I think the statute goes away. I mean, just to put it bluntly, I think here the fact that the government can regulate vertical integration through other means takes it away. Is that a matter of proof at the district court? Well, I don't think so here. I mean, the statute says what it says, and clearly by simply looking at different sections, the court can decide on its own that the government has found least restrictive ways to regulate vertical integration, and therefore that don't involve speech, and therefore that 25-503 is unconstitutional on its face. As to temperance, and I will simply— Well, is promoting—I know this seems like really, you know, I feel like the League to Restore Decency or something, but that being said, is promoting—I think just the passage of time doesn't necessarily mean that temperance isn't a substantial government interest, but what's your view? Is promoting temperance a substantial government interest? It might be, but the statute does nothing to promote temperance because it's not like they're outlawing advertising at the point of sale. It's perfectly legal. It's just you can't—it's just the wholesaler and manufacturer can't pay for it. So when you walk into a liquor store, there's advertising everywhere. That's the liquor store owner supposedly—and I say supposedly because who knows what really happens, but the liquor store owner supposedly puts this advertising on his own. Well, you wouldn't—once you've walked into a liquor store, you've already made the decision to buy the liquor. Exactly, and that's the other point I really— So the notion that this has anything to do with your meaningful suppression of the desire to buy alcohol is absurd. Correct. You're just choosing between which, you know, which evil are you going to have to— Could I ask you what— The clear one or the dark one, but— What is your client—is he an agent of whom or is he an agent of anybody? Well, I mean, my client puts up—or tried to put up displays, LCD, LED displays in liquor stores. So he's, in effect, something like an independent contractor. He's really an agent of nobody. Correct, correct. Well, does he come within the language of the prohibition? He does because the prohibition addresses the receipt of value from the point of sale's perspective. So it doesn't matter who pays. It doesn't matter who pays the liquor store owner or Ralph's or Costco, for that matter. As long as— I thought the statute says that all the—I'll make a shorthand that all of the manufacturers are prohibited or an agent of such person are prohibited from paying money or give or furnishing anything of value. I'm not reading the whole statute, but— Right, but I believe subsection— My point is that— Subsection H, I think, has a catch-all that basically states— I'm reading—that's what I'm reading from. So it basically prohibits the manufacturer and other specific persons named which are not your client or any agent of such person. So in this transaction, your client has got to be—it would only apply to your client to begin with if you were an agent of the liquor company. No, that's probably right. I mean, as the— So that's why I asked the question, is your client acting as an agent for anyone in this transaction? The only reason why I hesitate is the term agent has such legal ramifications, and I'm sure that— Well, it does, but— But it kind of— I think the courts decide the issue. It goes to what interest he's trying to protect. Correct. I think that's for the purpose— Have any cases held that this interest is protected by the First Amendment? You know, I think for the purpose of this statute, certainly my client would be considered the agent of the brand. There's no question that— Well, I know you guys aren't—no one's contesting standing or article—you know, whatever it is here, but that doesn't mean we don't look at it. Oh, absolutely. No, I understand. I understand that. I do believe that for the purpose of the transaction, Retailer General Network acts as the agent of the liquor brand in advertising their interest. And also, I do believe that the statute contains a catch-all, which prohibits the point-of-sale owner from receiving anything of value for the purpose of advertising. So are you seeking to protect your interest in being paid to facilitate someone else's commercial speech? Is that what you're saying? Well, but also, no. Also, our own commercial speech. The Retailer General Network here is prevented from advertising in liquor stores and or paying liquor store owners for the benefit of advertising in their stores. So there's not only a claim on behalf of the liquor brands as their agent, but also as an individual claimant for our own right to practice speech in point-of-sale liquor stores or point-of-sale retail establishments by giving money to the establishment's owner. My time is up. Could I ask you one last question? Judge Carman has a question. I think you may make the argument in your brief. I don't recall. But is there any risk today that there are going to be – that manufacturers are going to in any way undertake to control the sale of liquor in the way that the legislature was concerned about when it enacted the statute? There isn't, Your Honor, and this is not necessarily a point that we've made in the brief, but the reality of the liquor market today is that the retailers have so much more power than the brands in distributing liquor. And in fact, what the regulation is doing is it's preventing the little guys who don't have the marketing power of the big brands to be able to make an entry into the point-of-sale and being able to advertise their goods at the point-of-sale. But without developing that in a record, it would seem to me that you're asking us to, on our own, decide that there's a sunset to what their governmental interest is since it was so long ago as opposed to really examining that, whether it's protectual now or what the situation is. I recognize that, and that's what we're looking for. You were just answering the question. Correct. All right. We'll give you some time for rebuttal. Thank you. I don't need it. Thank you. Yeah, but he might. Good morning, Your Honors. Good morning. May it please the Court. Gabrielle Brembach on behalf of the appellees. Jacob Appelsmith as the Director of the California Department of Alcoholic Beverage Control. The District Court's granting a summary judgment in this matter was proper. In holding that Business and Professions Code Section 25503 is constitutional, the District Court relied on this Court's opinion in ACT Media, and ACT Media is precedential in this circuit. Well, it is, but if Sorrell – I mean, last I checked, the U.S. Supreme Court has – we have to go with them, and they don't automatically overrule everything. And so, I mean, is it your point that we should ignore the dicta in the Supreme Court statement in Sorrell that heightened scrutiny of content-based restrictions on commercial speech is required? Well, Sorrell is actually distinguishable from this case, and it's the appellee's position that Sorrell does not apply. That's where I think what I'm saying is I think both of you are – you have nice, pat answers to facilitate the result that you want, but I think our job's a little bit harder. I don't think you can just brush Sorrell under the rug. Well, I understand, and in terms of how Sorrell, though, is distinguishable is that while it is content-based and speaker-based, the Sorrell Court also recognized and noted that it actually – the manner in which the statute there operated was viewpoint discrimination. And in that case, the way the statute actually worked is that the individuals who sought to obtain the information for the pharmaceutical companies to market the data for the prescriber-identifying information, they had to obtain the consent from the physician and pay money in order to access the information. Or if that consent was not granted by the physicians, then they had no ability to access that information, and the information was freely, though, available for other purposes. And so the Sorrell Court – That is correct, Your Honor, and in Sorrell – So what I want to ask you is what is the purpose right now of the statute? You're not saying that if that – in our decision, we said that the provision was enacted in 1935, shortly after the repeal of the 18th Amendment and the end of Prohibition, as a part of California's tie-house statute, so named because they were intended to prevent the return of saloons operated by liquor manufacturers, which had been prevalent in the early 1900s. That's not a concern anymore. They're not going to – you know, Bacardi is not going to start operating saloons to sell Bacardi. And is it really – is there any – what is today the harm that, in reality, is being prevented? And here's the court's question, and it would go to the third central Hudson prong, whether or not this directly advances the government's interest. Well, in the Rubin case, the court said that a government body seeking to sustain a restriction on commercial speech must demonstrate the harms it recites are real and that its restrictions will, in fact, alleviate them to a substantial degree. Now, I don't – what I have trouble with here is that I don't – as a practical matter, what the California legislature was concerned about in 1935 in enacting this scheme couldn't happen today as a practical matter. And what is essentially then left? Well, this particular statute is part of a greater statutory framework known as the tied house provision. And the rationale and the evidence that would support this statute does go back to history pre-prohibition days in terms of the concern of the tied houses that existed pre-prohibition, but also in the record that was before the district court, there was evidence provided to the court that – regarding the manner in which alcohol is regulated in the United Kingdom today. And in the United Kingdom, the alcohol deregulation has been occurring there slowly over a period of time, since the 1960s to the 2000s. And the business there in the United Kingdom is vertically integrated, and there's four large retailers that buy the alcohol in large quantities at a significant discount. And the result is then that the wholesalers, there's limited or nonexistent, and there are very few retailers. What exists today in the U.K. is that there's aggressive sales and marketing and price wars. And then the result is that they have had an increased hospitalization due to alcohol, which has doubled in the last 10 years. And there's been underage drinking as well that's twice that instead of the U.S. I'm not familiar with the United Kingdom and what the culture and the profits are there. There is all sorts of – there's all sorts of advertising that can be engaged in. What I'm trying to get at is, is it today in the United States, and more particularly in California, at all likely that you're going to have, as a practical matter, vertical integration without – first of all, with or without this prohibition on paying for the retail owner for the right to advertise a particular brand? I mean, is it really likely there's going to be a liquor store that only sells Bacardi? Well, the concern here, Your Honor, is that if the payment is allowed and an advertiser is allowed to pay for the privilege of advertising at the point of sale, there will become this financial relationship that, while not immediately, over time it will come to be that only a few alcohol manufacturers will dominate the market. And that goes against the whole rationale behind the general Tide House statutes, the entire framework, which is to prevent the vertical and the horizontal integration and to have the market – And the reason for preventing this vertical and horizontal integration is simply to prevent people from drinking? Well, it – Discourage. Discourage the sale of alcohol. It is – it was designed, when it was passed, to prevent what had existed pre-prohibition. And if it were – let's assume it were repealed today, would there really – would it really be likely that we're going to have vertical and horizontal integration, given the nature of the market? Your Honor, it likely could become vertical – vertically and horizontally integrated again. And the example which was provided in the record was how things have happened in the United Kingdom. And – So that any of those things in the United Kingdom occur because somebody used an LED screen? Your Honor, I – it's not – I mean, it's kind of a good question. They don't have to – they don't have to analyze this under Sorrel, either. Excuse me? The United Kingdom isn't controlled by Sorrel, either, right? No, no, it's not. But you kind of get into Judge Kerman's question. A guy walks into a liquor store, and he's not looking to get Cary Nation's memorabilia. He's going to buy liquor. And there are advertisements all over the liquor store, and what the state of California says, yeah, but you can't pay someone to put a liquid LCD display that will advertise a certain kind of liquor, even though the whole store already is filled with liquor. And the idea is either to prevent vertical integration, which can't occur because you're paying somebody anyway, or two, to stop people drinking, and they're already there and bombarded by advertisements. So it does seem, in this century, a little absurd. Well, Your Honor, the statute itself, interestingly, it really is designed to prevent that economic relationship. They can advertise for free at the point of sale, which is why we all – No, but that sort of doesn't make – it just suggests that this restriction is silly. Again, I want to read to you the last part. You must demonstrate that the harms it recites, that is the scheme here, are real, and that its restriction on the speech will, in fact, alleviate them to a substantial degree. That is correct, Your Honor. Now, how does that alleviate it to a substantial degree? Well, looking back then to history and historically what happened in the pre-obission times, when there was no regulation in the marketplace and the manufacturers owned the saloons, there was significant social problems and the cost of alcohol was really decreased. And now, though, and that's really – we have to go into the history of this, and that's where the statute evolved from. Well, yes, but let me stop you there. Let's take one purpose at a time. How does it increase temperance to say that a store can't accept money for a paid advertisement but it can put up advertisements all over? Well, it could increase temperance because by precluding the manufacturer or the wholesaler from paying the retailer any money for the privilege of advertising at the point of sale, it would – But that's speech. That's speech. You're trying to control the type of liquor purchased, not the sale of liquor, because that's the business of the retail liquor store is to sell liquor. Correct, and really the statute is designed at precluding the payment of monies from a manufacturer or wholesaler to a retailer. That's really the purpose of the statute, so that there's no connection. Yeah, but what's accomplished? How does it, in fact, alleviate to a substantial degree the evils that the statute was – that the overall statutory scheme was intended to accomplish? Because Section 25503 is a catch-all part of an intricate statutory framework for the Tide House provisions, and by prohibiting that payment from being made, then the manufacturers and the wholesalers cannot disguise advertising payments as something else, and if they could pay the retailer for the privilege of advertising, those payments could be disguised and inflated in a way to – That creates what evil, assuming that that's the least restrictive way of enforcing the statute? So what? Well – So they couldn't determine it without going into – let's assume it's too difficult for them to determine whether a particular payment for a particular point of advertising was really market value. Couldn't they, for example, given the way – given the facts that we're dealing with in this case, where we're dealing with this intermediary, so to speak, they could – first of all, they could find out whether, just by looking at what's being sold in a particular liquor store, whether there's an inordinate amount of Bacardi rum being sold as opposed to something else. But they could also look at the books of this intermediary – this is sort of a broker in my mind who's bringing a willing buyer to a willing seller – and see whether or not these payments are sort of out of line. I mean, this doesn't strike me. Your own expert said he couldn't – I believe said he couldn't say that this particular restriction – he couldn't tell how it actually – what impact it had. Well – And that gets me to the fact that the restriction will, in fact, alleviate the evils to a substantial degree. It seems to me, at best, you could say, well, it'll help you in the enforcement, maybe. Okay. I wanted to – if I could back up just a bit, because I wanted to finish the answer to the question that the court previously had in terms of how the financial relationship between the parties and what that impact would be, which is that if there was that financial relationship, then what likely would occur is that a few manufacturers or wholesalers would then dominate the market. And the prices of the alcohol would be significantly reduced, and there would be the aggressive marketing techniques because of the financial benefits would then result. But you're one stage removed here. This isn't a manufacturer who wants to pay directly. This is an intermediary who wants to put up an LED screen and then sell space on it, just like somebody who owns the billboard above the retail store. So there's no direct – in this instance, in this suit, there's no direct relationship between any particular manufacturer and the retailer, right? And that's correct. And so because of that, actually, my understanding of how it would work in this situation is that Retail Digital Network is actually not even under the Department of Alcoholic Beverage Control's jurisdiction. They would have no ability to compel Retail Digital Network to say, hey, we need to see your books. What exactly is happening here? They have jurisdiction over the manufacturer, the wholesaler, and the retailer. That's the fault of the California legislature. I mean, they could give that authority. I mean, that's what we're talking about, a legislative scheme. So instead of giving that authority, they're basically curtailing speech. Well, the speech is actually – I would respectfully disagree with the court that the speech is not curtailed, but it's the flow of money that is being curtailed. And I see that I'm out of time, but if I may just finish this question. I'm going to have to ask the Chief for some time to ask you some questions, too, so you may keep talking. Okay, thank you. Well, thank you. This is granted. Thank you. I knew you were going to say no. You asked for more time than you granted yourself. I know. I know you're going to give it to me. Let's wait and see. Okay, so in terms of the ability for the government to actually police each and every contract or agreement for advertisement that's entered into throughout the entire state amongst – in this situation where you have an intermediary such as Retail Digital Network, it's feasibly – it simply is just not feasible for the department to come in and to audit. Yeah, but you agreed that they could come in and audit the books of the plaintiff here and easily determine whether this evil, assuming it's even realistic, is actually taking place. And you just said – and your answer to that was, well, the Alcohol, Beverage, and Control Board doesn't have the power to subpoena his books, but that's because the legislature hasn't given him the power. And so I still don't see how this is a – your restriction in fact alleviates the evil to a substantial degree. Well, and I guess the other thing is in terms of your answer, when you talk about all of the intermediaries, doesn't that argue that there's really no real threat of vertical integration by virtue of this particular provision? Because as applied to the advertiser in the middle, just buying – he's just saying, I want – I'm just putting up a LCD board, I'm going to sell it. There's no direct relationship between the wholesaler, the manufacturer, and the retailer. It's an advertising mechanism. So how does that create tying? Well, it creates tying because the intermediary here, Retail Digital Network, is receiving money from the manufacturer for the advertising. And it's also then receiving money from the retailer. And really, the money is flowing through the intermediary here, Retail Digital Network. So it's just taking one little turn in the manner in which the money would flow. But there's still money flowing between the wholesaler, manufacturer, and the retailer, which is what Section 25503 prohibits. Judge Connelly has some questions. May I? Chief, may I? Thank you. Here's – I'm only speaking for myself, but here's some of the problems that I have with your argument. I don't think we can ignore Sorrell. But – and so if for the moment, if you would assume that Sorrell requires a heightened judicial scrutiny of content-based restrictions on non-misleading commercial speech regarding legal products, which it's all of those things, in your view, what would that heightened judicial scrutiny entail? And the district court here didn't do it that way. We know that. And so if this court were to find that ACT Media is no longer controlling, should it go back to the district court so that the record can be developed? I mean, there's a lot – you're talking all about the U.K. and this, that, and the other. And, well, Sorrell has no effect on the U.K. and all of that. We have to look through a different lens. So if we don't – if – I'm saying I'm not – I don't think you can sweep Sorrell under the carpet the way that you want to. I think there is some heightened judicial scrutiny. I don't know how to write it and say exactly what it is or how it goes into Henson. But if that were the case, should it go back to the district court? Okay, so the first question is what would be the heightened scrutiny under Sorrell? And Sorrell does not define that, and that's what has been unclear, I think, to many parties. It mentions that if there is a content- and speaker-based regulation and it actually tends to direct a certain viewpoint, then the heightened level would apply. But then Sorrell turns back and actually applies a central Hudson analysis and says that even under central Hudson or some other higher level of scrutiny that the statute does not survive constitutional muster. So perhaps it doesn't say strict scrutiny either. Well, I guess the other thing is, too, that I think there – I mean, conceivably, there might be a way that you could win under the – if 25503's primary purpose is suppressing vertical integration, if that's permissible, I mean, that's your strongest argument, but its secondary purpose is suppressing the advertising of alcoholic beverages, which is impermissible after Sorrell. What's the strongest argument that we can affirm if one is okay and the other suppresses speech? Because the promoting temperance is the second one, right? Well, it's indirectly promoting temperance. And you've heard the panel talking about if you're going into a liquor store already, you're not feeling temperant probably. So how is suppressing the commercial speech going to promote that? I think you've got a hard rock to push uphill on that. The vertical integration, maybe. But if you have both of those there, can you still uphold the statute? Well – I mean, what's the best authority for – if one's good and one's bad, what's the best authority that we can still uphold the statute? Which interest is the stronger one? It sounds like, I mean, the interest would be the vertical and horizontal. But is there a case that you can point out that says if we've got one good one and one bad one? I'm not aware of a case at the top of my head at the moment. But certainly in terms of the second basis for Section 25503 in terms of the governmental interest, it goes to preventing the aggressive marketing techniques, which is the language I believe the courts are taking. Is that an end in and of itself? That gets me to a question. You have a sentence in your brief that suggests they're inextricably related. You say, contrary to RDN's assertion, the Erickson Report as a whole outlines the problems that occurred prior to Prohibition. And this is the sentence that I want to ask you about. Then you say, the fact that such problems no longer exist evidences that there is a link between Section 25503's provisions and California's stated interest of promoting temperance. So as I read that, you're acknowledging that there's an inextricable tie between the desire to promote temperance and these restrictions. That is correct, Your Honor. And so I don't quite understand how the particular restriction at issue here operates to promote temperance. I mean, you talked about the United Kingdom. I found what I had in my head. There was a study in the ACTA Media case where Coors paid to have its advertising in a particular supermarket and it disclosed that there was no greater sale of liquor in those supermarkets. There was a slight increase in the amount of 6% increase in the amount of people who bought Coors beer at the expense of other beer companies, but no overall increase in the amount of beer that was actually sold. So this is right here in California, not the United Kingdom. Well, so in terms of promoting temperance, the way in which the statute operates to promote temperance is that by precluding the financial relationship, the prices of alcohol could not be artificially reduced and making the cost of alcohol itself less. So with your overly aggressive marketing techniques, are you talking about, like, sales practices, prior sales of alcohol, or what are we... It would be going to the, yes, it would be reducing the cost and the financial relationship that would exist if a retailer or a wholesaler were allowed to pay, rather, a manufacturer or a wholesaler were allowed to pay the retailer money for the privilege of advertising, it could be... But that's not this case. By cheaper alcohol, and so at last, you know, so you pay less for the alcohol you were going to drink anyway, or does it mean that if there's aggressive techniques, that you suddenly, it's sort of like Reaper Madness, that you suddenly up your alcohol intake to, you know, since you can get it really cheap, now you drink four glasses of wine a day instead of two? I mean, do we have that kind of link there? I mean, I think... I don't have any evidence in the record to suggest that that link actually exists. That's an inference that's made from what could happen if the financial relationship would exist. Right, but I think your theory is, if I understand it, is that if you have true vertical integration, you have manufacturers operating on a retail basis, then they eliminate the middle costs and they can sell alcohol more cheaply. That's the theory, right? Correct. So how does that fit this case? Because all you have is a middle person who wants to advertise, and there's no direct relationship, and therefore there's no way that the manufacturer can control the cost of retail alcohol. Well, the manufacturer could actually. How? Via the middle person. How? Well, there's no indication that, or guarantee that any of the money that are given by the wholesaler or manufacturer to the middle person... There's no guarantee that that is really truly for the cost of advertising, and that perhaps then here a middle person, such as Retail Digital Network, could actually pay the manufacturer an amount that's higher than what is actually provided for the value of the privilege of advertising. So what? So you go into the store, and you have this LCD screen, and it flashes a number of different items, whether it's Guinness or whatever, and it advertises the LCD screen. One of the values of that is you change the screen from time to time. So it advertises there. That doesn't mean the retailer is going to reduce the price of Guinness or Bacardi or anything else. It just means that he gets a 6% or whatever amount of money for having the screen in, right? Well... So I guess I'm trying to understand the economic theory as it works in this particular case. I understand vertical integration, but this isn't vertical integration. Well, this is one statute that's part of a larger statutory framework. Well, sure. Okay, so if you eliminate this part, does the statutory framework collapse? It could begin the collapse of the statutory framework, because here the department is not capable of policing every single such contract that would be entered into throughout the entire state. And if this contract were allowed to go forward and money be paid to the intermediary, then there's no way of telling whether or not the money that are paid to the retailer are truly for the value of advertising. And, in fact, the concern is then that the amount would be an exorbitant amount and that they would then... a particular retailer would say, Oh, geez, you know, for instance, Bacardi came in and said, Hey, we're going to pay so much money and we want to pay a lot more than any other maker or manufacturer, and then that particular manufacturer would get favored treatment. The cost of that particular alcohol would be reduced, and it would then slowly turn into a market that is vertically integrated. And the manufacturer would get favored treatment by the retailer because they're getting paid more money to have that particular product advertised. Well, what's wrong with that? It happens all the time. And you go into a supermarket, as I understand how it works, they have a sale. You can go into a supermarket and buy two bottles of wine and they'll say we'll give you 50% off. If you buy one, we'll give you one free. And the reason they're normally able to do that with respect to orange juice is because the orange juice company is willing to underwrite the cost of the sale so that the product could be promoted. So what's wrong with that? If you're not basically increasing the amount of people who drink. I'm not familiar. I see, obviously, in the marketplace how people can purchase six bottles of wine for a lower amount, for instance, but I'm not familiar with the relationship of how that all works. If they put orange juice on sale, two for $5 instead of two for $7, that's in part, as I understand how it works, because the orange juice company is at least in part underwriting the cost of the sale. So what's wrong with that? The consumer is getting the product for less money. They're not going to drink. There's a limit to how much orange juice you can drink. Well, and orange juice is not the same as alcohol. It also has a very different nature of the type of product and the regulatory framework for alcohol has a very different statutory basis in history for the reasons behind it. And here the great concern is that if payments are allowed to be made, even if it's through an intermediary, from a manufacturer or wholesaler to the retailer, that that would begin to uncrumble the entire Tide House framework. And there would be saloons operated by Bacardi Rum. Is that what you think is realistic now? It's possible. Anything is possible. Slowly over time it could happen. I couldn't obviously predict the future, but that's the concern. Let me go back to the legal theory here for a minute and follow up on one of Judge Callahan's questions, which is how we apply Sorrel in this context. One of the suggestions by one of the courts, the Seventh Circuit in Alvarez, is that what Sorrel means is that you change the fourth prong of Central Hudson, and you have to add that the measure is drawn to achieve that interest. In other words, it directly advances a substantial government interest and that the measure is drawn to achieve that interest. Is that the correct way of figuring out how Sorrel, if applicable to this case, would apply to Central Hudson? Because some people say, well, it just heightens scrutiny. Some courts have said it actually changes the framework of Central Hudson itself. What do you think? Well, that would be a reasonable way of approaching it, and the fourth prong has been modified over the years from being no more extensive than necessary to a reasonable fit under the court's opinion in Edenfield, and now if the measure would be drawn to achieve that interest, it would appear that in this situation the fourth prong would be satisfied because Section 25503 only allows advertising for free, and it's geared towards controlling the financial relationship, and so that's why Section 25503 only applies to advertising by a manufacturer or wholesaler at the point of sale, and that they're not allowed to pay money for that privilege to the retailer. So it would seem that even if this court were to adopt that fourth prong, as outlined by the Seventh Circuit, that in this situation it would be satisfied. Well, I understand your argument. I guess I share some of Judge Callahan's concern is that we're writing on a broader canvas here, and I'm not sure saying if we were to send it back to the district court you have to apply heightened scrutiny would give enough guidance to anyone to tell them how to do their job, and that was the solution of the Seventh Circuit, and you seem to think that's an okay solution. To remand it back to the district court? No, no, no. I'm talking about that Sorrell means the heightened scrutiny, in part under Sorrell, means that you modify the fourth central Hudson factor. Well, and if it's to modify it as the court suggested, that would seem like... Okay. Are you satisfied with the state of the record at this point? I mean, if this were remanded, would you want a full evidentiary hearing, or do you think you put in the state's position sufficiently before the district court? I mean, you put in the U.K. material. I mean, is there anything else you would put in on remand? I know you don't want to commit yourself today, but as you stand here today, do you feel like you've completed your record? Well, yes. I mean, at the time of filing the summary judgment motion, we felt like we put everything in there that we had. I mean, if given the opportunity, I can't say that we wouldn't put any additional information in, but I can't really commit to that. Well, if it were going back, it would be going back with saying Sorrell makes a difference, which is not what the district court did. So I guess that if your canvas were that Sorrell requires heightened scrutiny and let's just say hypothetically that it would be like the Seventh Circuit, would that necessitate more evidence on your part to satisfy that? Well, yes, at that time. Then I would like to have the opportunity to put more evidence into the record if the court were to remand this back to us. And what kind of evidence? I realize we're jumping ahead here, but what kind of evidence as you stand here today would you think that would be? Well, I think that the government would want to put in some additional evidence about the substantial governmental interest and then also the manner in which the statute actually operates. It would go to the fourth prong and also the third Hudson prong. And I honestly, at the present time, I'm not sure. What does the record have right now about overly aggressive marketing techniques, something that you rely on to on the temperance justification? What do you have in the record about that? We don't have very much at all in that. And, in fact, at the district court level, the first two central Hudson prongs were not litigated at all. We did not contest those, nor did the other side. So to the extent that that would go to the second central Hudson prong to go to the government's substantial interest, I would want to put in more information about overly aggressive marketing techniques and perhaps find some examples that exist from prior situations that the department has been involved in. In the district court was the issue of, since what I've pointed out, that I'm sort of seeing this as that the statute has two. First, the vertical integration, but then also the temperance part of it. And I have problems with the temperance part of it. Was that at all addressed in the district court, or did you respond to that at all, or did everyone just basically roll over on all of that and then move on? The first two prongs were not addressed at all. And so that second prong that would go to the vertical and horizontal integration as well as the temperance aspect being part of that was not discussed at all. And that was something that was not disputed by either party. No, I think everybody conceded the first two prongs. Correct. Do you concede the first prong? Yes. And it's up to them to concede the second prong if they wish to. Pardon? It's up to them to concede the second prong if they wish to. Correct. Put you on your proof. Correct. Okay. Where are we? Are we finished with our questions? I am finished. I don't know if he said a no rebuttal. All right. Thank you. Well, you did say no rebuttal, but we'll give you some. But, you know, why don't you start with this panel? We could go on until after dinner. I was going to make a joke. I had a plane to catch. But I want to address one point, which is that this notion that vertical integration is going to somehow reduce liquor prices in the state of California. They're using vertical integration to prevent consumption. So the two arguments are tied. There's nothing in the law that says that Bacardi can't sell rum for $3 a bottle. So liquor brands today can lower prices. Obviously, it's against their self-interest. I mean, there's competition in the marketplace. It's a robust market, plenty of players. And to the extent that there is a significant drop in price because of the striking of this regulation, the state can always enact taxes. The state can regulate the price of alcohol through higher tax on alcohol. So the notion that, you know, removing vertical integration is going to somehow make the price of alcohol tumble in the state of California, which will then lead to greater consumption, I think can be addressed. I think it's not true. But even if it were, I think it can be addressed through means that don't restrict speech. And so I think what the record has below about that, about the relationship between the aggressive techniques and temperance. I don't believe the record was fleshed out on that particular issue. The government filed its motion for summary judgment and included very little evidence. It did include the study and an expert report relating to the statutory framework, the study in England, but had no evidence relating to aggressive bargaining techniques. I think there was some deposition testimony in the record from my client and some of the materials that they used to sell, essentially the placement of these devices that said that advertising works. And I think it does. But I think it, like the court mentioned, it's simply people who would have bought Bud end up buying another brand of beer, Guinness, for instance. Of course. Of course. No, that was a study in the earlier case. Right. So there's certainly no evidence, and the government presented no evidence, that advertising increases the overall consumption of alcohol. And, in fact, advertising is allowed. There's advertising everywhere. They advertise television, magazines, billboards. It's all over the city. So I want to thank the court for the time. I really do appreciate it. And it's always an honor to argue before this court. Well, thank you both for your arguments. Our questions took you way over time, but that's what oral argument is for. And we want to make sure that everybody gets their questions and you have an opportunity to present your case. So thank you both for your arguments this morning. The case just arguably submitted for decision and will be in recess for the morning.
judges: Korman, Thomas, Callahan